UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JENNIFER WESTENDORF,<br><br>        Plaintiff,<br><br>v.<br><br>WEST COAST CONTRACTORS OF<br>NEVADA AND DOES I-X,<br><br>        Defendants. | 3:09-CV-00272-LRH-RAM<br><br><u>ORDER</u> |

Before the court is Defendant's Motion for Summary Judgment (#28[1]). Plaintiff filed an opposition (#33), and Defendant filed a reply (#37).

**I.      Facts and Procedural History**[2]

This action involves allegations of sexual harassment, gender discrimination, and retaliation. Plaintiff Jennifer Westendorf ("Westendorf") was employed by Defendant West Coast Contractors of Nevada ("West Coast"), a construction company, as a project manager assistant ("PMA") from February 9 through July 29, 2008. As a PMA, Westendorf provided administrative support to her assigned project manager and immediate supervisor, Dan Joslyn ("Joslyn"). Above Joslyn were West Coast's president Mario Ramirez ("Mario") and vice president Andy Ramirez

---

[1] Refers to the court's docket entry number.

[2] The facts are recited by taking the evidence in the light most favorable to the plaintiff, as the non-moving party.

("Andy"), who is Mario's son. Westendorf was assigned to two projects managed by Joslyn, including the "RTC" project. The project superintendent for that project was Pat Ellis ("Ellis"), who worked primarily at the RTC job site. Westendorf worked primarily out of the main office, but in May 2008 she started going to the trailer at the RTC job site approximately one day per week. Westendorf saw Ellis only when he occasionally came to the main office or when she went to the job site. Although Ellis was a project superintendent, he was not Westendorf's supervisor, had no authority over the terms of her employment, and was effectively her co-worker. *See* Doc. #29, Exh. 1, Westendorf Depo. at 141. Joslyn was the immediate supervisor of both Ellis and Westendorf. *Id.* at 150.

Westendorf alleges approximately seven incidents of sexual harassment by Joslyn and Ellis. *See id.* at 166. First, within the first month of Westendorf's employment, Joslyn told Westendorf she had "girly work" to do, meaning typing and filing. *Id.* at 94. Westendorf told Joslyn she did not appreciate his comment but did not report it to Mario. *Id.* Subsequently, Joslyn apologized after Westendorf made a comment to a female co-worker in Joslyn's presence about getting back to their "girly work." *Id.* Through that co-worker and others, Mario eventually heard about the incident and confronted Westendorf. *Id.* at 94-96. Mario told Westendorf about past problems he had with Joslyn and that if she had a problem with Joslyn again she was to tell Mario. *Id.* at 95-96.

Second, in February or March 2008, Joslyn became angry about Mario and Andy having Westendorf perform a lot of work in the office, taking her away from being Joslyn's dedicated PMA. Joslyn cursed and talked "nasty" about Mario and Andy in Westendorf's presence, putting her in an awkward position and making her feel uncomfortable. *Id.* at 97. Westendorf told Joslyn that if he had a problem with it he should talk to Mario and Andy because she was only doing what the company was asking her. *Id.* at 97-98. Westendorf told the same thing to Mario and Andy, although she did not say what Joslyn said about them. *Id.* at 98-100. Mario and Andy told her they would talk to Joslyn and take care of it. *Id.* at 100-101.

Third, in approximately June 2008, Joslyn and Ellis made inappropriate comments in

1  Westendorf's presence about a woman who attended a West Coast barbecue at the RTC site. A
2  few days before, Ellis came to the trailer where Westendorf was working "all excited" to tell Joslyn
3  that the woman would be attending the barbecue. *Id.* at 103-04. Ellis referred to the woman as
4  "double D," Westendorf told them she "didn't want to hear it" and to "take it outside," and Ellis
5  and Joslyn both made comments about the size of the woman's breasts. *Id.* at 104-05. At the
6  barbecue, Joslyn and Ellis continued to talk about the woman in the presence of Westendorf and
7  other female employees, they asked Westendorf if she "was intimidated by [the woman's] breast
8  size," and Westendorf responded that she was 45 years old and her "days of being . . . insecure
9  about a 20-year-old are over with." *Id.* at 105-06. After the woman hugged Ellis goodbye and left,
10 Joslyn and Andy started "rubbing on" Ellis and saying "oh, rub some of her on me." *Id.* at 106.
11 Westendorf also thought it was inappropriate that the men were drinking alcohol at the barbecue.
12 *Id.* at 103, 106. Within a few days, Westendorf complained about the inappropriate comments to
13 Mario, who told her that "it was all unacceptable, it can't be going on anymore." *Id.* at 111-12.
14      Fourth, in approximately mid-June 2008, Ellis made inappropriate comments to Westendorf
15 regarding tampons. Ellis came into the trailer where Westendorf and Joslyn were working and told
16 Westendorf he wanted to know about tampons. *Id.* at 149-50. Westendorf said she was not
17 interested and to take the conversation elsewhere. *Id.* at 150. Westendorf describes Ellis' further
18 comments as follows: "And then he went on to say that there's so many of them and he had to go
19 last night to buy some for his daughter. And there's tampons with pearls on them and he wanted to
20 know what the pearls did for us women. Did it get us off, could we sit there all day with the pearls
21 rubbing up against us and feeling good all day." *Id.* Westendorf told Ellis to "shut up" and that
22 she did not need to hear it. *Id.* Joslyn must have heard Ellis given their proximity but he did not
23 intervene; he "sat there," "said nothing," and "laughed, chuckled." *Id.* at 150-51. Westendorf
24 complained to Mario within 72 hours. *Id.* at 152.
25      Fifth, within a week later, Ellis said to Westendorf that "women were lucky because [they]
26 got to have multiple orgasms." *Id.* at 159. Westendorf told Ellis to "shut up" and left the room.

3

1  *Id.* at 159.  Joslyn was also present and "snickered" or "smiled" but did not say anything.  *Id.* at

2  160-61.  Westendorf complained to Mario within 72 hours, and Mario gave his "standard answer"

3  that "this can't go on anymore."  *Id.* at 163.

4        Sixth, on or about July 8, 2008, Ellis used profanity toward Westendorf during a

5  conversation about his kidney stones with Joslyn present.  Westendorf later reported the incident to

6  Mario and Andy as follows:

7      Okay.  Last Tuesday I went to the trailer, RTC, was talking with Dan [Joslyn].  Pat [Ellis] had been out sick the day before  Apparently he was passing a kidney stone.  Dan and I were talking in the back of the trailer in Dan's office.  Pat came in – Pat came in started asking Dan a question about one of the subcontractors and how come he left the job yesterday, and Dan said that he wasn't feeling good, he had a stomachache, so he went home.  And Pat said, "Well, that's what the Sani Huts are for outside."  So I said, "Well, maybe that's what you should have done yesterday."  And he looked at me and said, "Fuck you."  And it wasn't a joke "Fuck you."  It was, you know, strong.  And then he said to me, "Have you ever passed a kidney stone?"  And I said, "No."  And he said, "Well fuck you, then."  And I was like, "Did you just say, 'Fuck you,' to me?"  And he said, "Yeah, I did.  Fuck you."  And that was that, and Dan sat there and said nothing.

14  Doc. #30, Exh. A at 2-3.  Westendorf then looked at Joslyn and said, "This is allowable, Dan?

15  He's allowed to say fuck you to me like this?  That's okay with you?"  Doc. #29, Exh. 1 at 143.

16  Joslyn did not intervene and "just smiled."  *Id.*  Probably an hour or more later, or possibly the next

17  day, Ellis apologized to Westendorf.  *Id.*  Although Ellis used profanity regularly, that was the only

18  time he cursed at Westendorf.  *Id.*  Westendorf also used profanity and was not offended by others

19  cursing; however, being cursed at did offend her.  *See* Doc. #30, Exh. A at 7-8.  She reported the

20  "F-U" incident to Mario the next day.  *Id.* at 4-5.  Mario responded by saying "[l]ike he always

21  said, we can't have this anymore.  I'm going to talk with them."  Doc. #29, Exh. 1 at 144-45.

22        Seventh, Ellis regularly made comments to Westendorf about bringing a "maid's uniform"

23  or "French maid's costume" to clean the RTC trailer.  *Id.* at 15.  It started when Ellis told her the

24  trailer needed to be cleaned, Westendorf said that she would keep her space tidy but cleaning the

25  trailer was not in her job description, and Ellis said that "cleaning the trailer in a French maid's

26  costume was in [her] job description."  *Id.* at 155.  After that, he would make a similar comment

1 about bringing her "maid's costume" every time Westendorf went to the trailer and every time she
2 was on the phone with him. *Id.* Such comments began in approximately May 2008, and
3 Westendorf complained to Mario within 72 hours of it happening. *Id.* at 156-57. Mario told
4 Westendorf that he would talk to Ellis and to bring anything else to his attention. *Id.* at 157.

5 Following these incidents, on July 14, 2008, Mario and Andy held separate meetings with
6 Westendorf, Ellis and Joslyn, with a court reporter present. Mario's stated purpose was to "stop
7 whatever is happening, period." Doc. #30, Exh. A at 2. During Westendorf's interview, she
8 described the incidents where Ellis cursed at her and made comments about cleaning in a maid's
9 outfit, tampons, and multiple orgasms. *Id.* at 2-6. She did not mention the barbecue incident or the
10 earlier incidents involving Joslyn. When asked by Mario if anything else had happened,
11 Westendorf said there was "nothing that . . . bothers me that badly" but that Ellis was just "crude"
12 and that despite leaving the room or telling him to shut up, she didn't think "he gets it." *Id.* at 7.
13 Regarding Joslyn, Westendorf stated that he "was a little bit difficult," but after previous
14 conversations with Joslyn "everything has been fine with him as far as how he treats me," except
15 that Joslyn "lets [Ellis] talk to me the way he does without saying anything." *Id.* at 8. Westendorf
16 further stated to Mario and Andy that "you two have been so nice, and you know, I really do like
17 my job," except that "I hate going to work on Tuesdays" and "I just feel very uncomfortable being
18 out there" at the job site. *Id.* at 9. Andy and Mario told Westendorf that they were "going to stop
19 that" and "make it very clear to them that they're not to talk to you inappropriately." *Id.* at 9, 12.
20 They further instructed Westendorf to notify them if anything happens again but otherwise to "[d]o
21 your normal job" and do what Joslyn asks of her. *Id.* at 10, 12.

22 During Ellis' interview, Mario and Andy instructed Ellis that going forward he "cannot
23 make any jokes, innuendos" with Westendorf and that he was to only "speak [to her] in the context
24 of the job." Doc. #30, Exh. B at 8, 11. They further threatened Ellis with suspension or
25 termination if it happened again. *Id.* at 11. Based on the interview, Mario came to the conclusion
26 that Ellis "had said some comments that were inappropriate," and Mario subsequently disciplined

5

Ellis by withholding $5,000 that he was scheduled to receive. Doc. #29, Exh. 10 at 67-68.

During Joslyn's interview, Mario and Andy explained that Westendorf's complaints indicate her "level of being offended," and they instructed Joslyn that there were to be no more jokes, that he was to speak out if he witnesses offensive conversation, and that he was to limit conversations with Westendorf to her work duties. Doc. #30, Exh. C at 5-7. They further threatened Joslyn with penalties, suspension or termination if he failed to act accordingly. *Id.* at 8.

Following the July 14 meetings, Joslyn engaged in behavior that Westendorf viewed as retaliatory by "having, like, a revenge attitude" toward her, cursing at her, being "rude," "trying to pick fights," "setting [her] up to yell at [her]," and "nitpicking" about her job performance, whereas previously Joslyn had not treated her that way. Doc. #33, Exh. 1 at 82-83, 115-16. Westendorf talked about Joslyn's conduct with others but did not report it to her and Joslyn's superiors until July 29, 2008, after Mario returned from a week off. Before meeting with Mario that morning, Westendorf made a handwritten list of the retaliatory conduct that had occurred while he was away. Doc. #29, Exh. 1 at 75-76. Westendorf's list addresses the following incidents, among other things: (1) Joslyn "belittled" her in front of the subcontractors; (2) Joslyn told her he was smarter than her and that anything that was sent to their contact at the Air Guard must go through him; (3) Joslyn yelled at her again for helping out with estimating; (4) Joslyn instructed Westendorf to put a document in a binder even though the binder was sitting right in front of him, and when she told him he could handle it, Joslyn said, "Who is your boss, and what did he just tell you to do?" (5) Ellis later made a comment that "we better watch that or we might get in trouble for that, too"; and (6) Joslyn told Westendorf that Mario was wrong about a certain procedure and that she should listen to what Joslyn says because Mario doesn't know what he's talking about. Doc. #29, Exh. 11; *see also* Doc. #29, Exh. 1 at 77-89.

Prior to meeting with Westendorf, Mario's assistant told him that Westendorf had come into the office upset and said that she did not want to work with Joslyn and Ellis. Doc. #29, Exh. 10 at 54-55, 60. Mario then telephoned Joslyn. *Id.* at 39-40, 42. Joslyn informed Mario that

1  Westendorf had left the job site trailer that day after Joslyn had become upset with Westendorf for
2  failing to follow Joslyn's instructions to circulate a subcontractor's social invitation to West
3  Coast's employees, and for using Joslyn's daughter's wedding as an excuse for telling the
4  subcontractor that nobody could attend. *Id.* at 40-41. Joslyn also told Mario that Westendorf said
5  that she was not going to deal with this kind of treatment anymore and then left. Doc. 29, Exh. 12.
6       Mario then met with Westendorf. Westendorf testifies that she attempted to describe her
7  complaints to Mario, using her bullet points as a reference, but she did not give Mario a copy of
8  her list and Mario did not let her finish. Doc. #29, Exh. 1 at 77; Doc. #33, Exh. 1 at 129, 133. At
9  some point, Mario became angry and told her "that he was tired of listening to all this and that
10 obviously [she] had a problem getting along with [Joslyn] and that it would be best if [she] got
11 [her] personal items and left," which Westendorf took as being fired. *Id.* at 125, 130, 133-34.
12 Westendorf was then escorted from the building by Mario and two other employees. Westendorf
13 denies quitting or saying that she could not work there anymore, and she maintains that she was
14 terminated on July 29 because of her complaints that day. *Id.* at 170-71.
15      Mario testifies that during the meeting they also discussed the subcontractor invitation to
16 get her point of view and that he told her she should have circulated the invitation as Joslyn had
17 instructed her. Doc. #29, Exh. 10 at 43. Westendorf's version was essentially the same as Joslyn's
18 except that she said Joslyn used the phrase "F... Y..." approximately three times. Doc. #29, Exh.
19 12 at 1. Westendorf also pulled out her notes to tell Mario about Joslyn's conduct while Mario was
20 on vacation. *Id.* Regarding her complaint that Joslyn had told her to put a subcontractor list in a
21 binder, Mario told Westendorf that it was her responsibility to do so in the manner Joslyn
22 requested. Doc. #29, Exh. 10 at 45-46. Mario testifies that Westendorf disagreed and stated
23 essentially that if she disagrees with the way Joslyn wants something done, she does not have to do
24 it. *Id.* at 46. When Mario then asked if Westendorf would follow his (Mario's) instructions to do
25 something in a certain way if she disagreed, Westendorf responded that she would not. *Id.* at 47.
26 Mario testifies, "The conclusion that came about is that if she disagrees with it, even if it's in the

7

1 manual, even if I'm not asking her to do anything wrong, if she disagrees with it she is going to say
2 buddy, I don't have to do it." *Id.* Mario further testifies that Westendorf told him she could not
3 work there any longer, which he took as a resignation. *Id.* at 92; Doc. #29, Exh. 12 at 2.

4 Westendorf and Mario subsequently exchanged letters in which Mario stated that she quit
5 and Westendorf denied quitting and requested reinstatement. Doc. #29, Exh. 1 at 171; Exh. 10 at
6 52-53, 55. Although he denied firing her, Mario refused to reinstate Westendorf on the basis of her
7 refusal to follow instructions she disagreed with. *Id.* at 53.

8 After obtaining a right to sue letter from the EEOC, Westendorf initiated this action on May
9 28, 2009. Her complaint alleges three claims against West Coast for sexual harassment, gender
10 discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964. Doc. #1.
11 On April 8, 2010, West Coast filed the instant motion for summary judgment. Doc. #28.
12 Westendorf filed an opposition, Doc. #33, and West Coast filed a reply, Doc. #37.

13 **II.     Legal Standard**

14 Summary judgment is appropriate only when "the pleadings, depositions, answers to
15 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
16 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
17 of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence,
18 together with all inferences that can reasonably be drawn therefrom, must be read in the light most
19 favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
20 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.
21 2001).

22 The moving party bears the burden of informing the court of the basis for its motion, along
23 with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,
24 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party
25 must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could
26 find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.

1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the plaintiff. *See id.* at 252.

**III. Discussion**

   **A. Sexual Harassment**

Title VII prohibits employers from discriminating against individuals in the terms and conditions of employment on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of gender discrimination. "Sexual harassment, if committed or tolerated by the employer, becomes a new and onerous term of employment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). Westendorf alleges she endured sexual harassment in the form of a hostile work environment. To prevail on such a claim, she must show that: (1) she was subjected to verbal or physical conduct of a sexual nature, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). "The working environment must both subjectively and objectively be perceived as abusive." *Id.* The court considers the totality of the circumstances, which may include the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or a mere

offensive utterance, and the level of interference with work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Because Title VII is not intended as a general civility code, the law does not protect employees from simple teasing, offhand comments and isolated incidents (unless extremely serious); "conduct must be extreme to amount to a change in the terms or conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). And the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting § 2000e-2(a)(1), alteration in original).

Westendorf's allegations of sexual harassment cover essentially seven incidents or types of conduct spanning approximately six months: (1) Joslyn's "girly work" comment; (2) Joslyn's "nasty" criticisms of Mario and Andy; (3) Ellis and Joslyn's comments at the barbecue about another woman's breasts; (4) Ellis' remarks about tampons; (5) Ellis' remarks about female orgasms; (6) Ellis' use of profanity toward Westendorf; and (7) Ellis' repeated jokes about a French maid costume and cleaning the trailer. Of these seven, two had no sexual component or motivation: Joslyn's "nasty" criticisms were directed at Mario and Andy, not Westendorf, and regarded a work-related dispute between Westendorf's supervisors; and Ellis' use of profanity toward Westendorf was in response to a remark by Westendorf regarding Ellis passing a kidney stone, which Ellis took as an insult. Furthermore, the first three incidents were not even mentioned by Westendorf during her July 14, 2008 meeting with Mario, Andy and the court reporter. Instead, she reported that "everything has been fine" with Joslyn, with the sole exception that he did not intervene when Ellis made offensive remarks. The remaining three incidents—Ellis' "crude" remarks regarding tampons and female orgasms, and his repeated jokes about a maid costume and cleaning the trailer—were of a sexual or sexist nature but are properly characterized as "offensive utterances" and "teasing" marked by a lack of gender sensitivity, rather than "threatening or humiliating." *Faragher*, 524 U.S. at 787-88. In reporting the incidents, Westendorf herself described Ellis' comments as merely "pretty gross" and "crude." Doc. #30, Exh. A at 5, 7.

The court does not condone such inappropriate workplace behavior.  At the same time, however, Title VII is not "a general civility code."  *Oncale*, 523 U.S. at 80-81.  Even taking this conduct in the aggregate and viewing the facts in the light most favorable to Westendorf, it does not rise to the level of "extreme" conduct that has been held to be so severe or pervasive as to alter the conditions of employment and create an abusive work environment.  *Id.* at 786, 788; *see, e.g.*, *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee suffered a "relentless campaign" of personal abuse, including being referred to as "she" and "her" and being called a "faggot" and a "fucking female whore" by co-workers and supervisors "at least once a week and often several times a day").  Rather, the conduct Westendorf alleges even falls short of—or is at best comparable to—cases where the court found no hostile work environment despite offensive conduct specifically directed at the plaintiff.  *See, e.g.*, *Manatt v. Bank of America, NA*, 339 F.3d 792, 795-96, 799 (9th Cir. 2003) (colleagues told racially offensive jokes, called plaintiff a "China man" and "China woman," pulled their eyes back with their fingers to mock the appearances of Asians, and ridiculed plaintiff for word mispronunciations); *Brooks*, 229 F.3d at 924 (plaintiff's supervisor touched her stomach and "forced his hand underneath her sweater and bra to fondle her bare breast"); *Jordan v. Clark*, 847 F.2d 1368, 1375 (9th Cir. 1988) (plaintiff's supervisor made "sexist comments" and co-workers told "off-color jokes"); *see also Garity v. Potter*, 2008 WL 872992, *4-5 (D. Nev. 2008) (collecting other cases, and holding that "an unpleasant employment atmosphere" with coworkers and supervisors who were "rude, unfriendly, and even disliked" the plaintiff was insufficient).  The court therefore concludes that West Coast is entitled to judgment as a matter of law on Westendorf's sexual harassment claim.

**B.     Gender Discrimination**

Westendorf's second claim for relief is labeled "gender discrimination."  Doc. #1, p. 3.  However, Westendorf fails to articulate in either her complaint or opposition papers how this claim differs from her sexual harassment claim.  *See id.*; Doc. #33, p. 27.  "Sexual harassment is a species

11

of gender discrimination: Harassing an employee on account of sex is, conceptually, the same as refusing to hire on account of sex, or paying less for the same work, or imposing more onerous duties for the same pay." *Brooks*, 229 F.3d at 923.  Although gender discrimination may take other forms, Westendorf has failed to identify the theory on which her second claim for relief is based. Instead, she merely alleges that "[s]ome of the conduct to which plaintiff was subjected constituted gender discrimination . . . ."  Doc. #1, p. 3; *see also* Doc. #33, p. 27 (arguing only that her "evidence of discrimination" is not inadmissible hearsay).  Merely applying a more generic label to the same factual allegations does not make out a separate claim.  Summary judgment is therefore appropriate on the second gender discrimination claim as duplicative of the first.

## C.   Retaliation

In addition to prohibiting gender discrimination, Title VII also prohibits retaliation by making it unlawful "for an employer to discriminate against any of [its] employees . . . because [she] has opposed any practice that is made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two.  *Brooks*, 229 F.3d at 928 (citing *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)).  The burden of production then shifts to the employer to present a legitimate, non-retaliatory reason for the adverse employment action.  *Id.*  To avoid summary judgment, the plaintiff then must demonstrate the existence of a genuine issue of material fact as to whether the reason advanced by the employer was a pretext.  *Id.*

Westendorf alleges that her termination constituted retaliation.  Doc. #1, p. 3.  However, she does not allege that she was terminated or retaliated against because of her complaints about sexual harassment on July 14.  *See* Doc. #29, Exh. 1 at 169-70.  Indeed, the evidence is uncontroverted that following her complaints, West Coast's principals, Mario and Andy Ramirez, told Westendorf they would put a stop to the misconduct, to notify them if anything else happened, and to otherwise do her normal job; and they instructed Joslyn and Ellis to cease their inappropriate

12

behavior, threatened both with suspension or termination if it continued, and withheld $5,000 from Ellis.

Westendorf instead alleges that Mario terminated her because of her complaints on July 29 about harassment by Joslyn and Ellis while Mario was on vacation. *Id.* at 168-70. The problem with this theory, however, is that Westendorf's complaints were not protected activity under Title VII. By Westendorf's own description, her complaints regarded a single remark by Ellis about watching their behavior and multiple work-related encounters with Joslyn involving criticisms of her job performance, cursing, rudeness, yelling, and "nitpicking." These complaints involve nothing more than work-related, non-sexual "petty harassment," not an unlawful employment practice under Title VII. *Swenson v. Potter*, 271 F.3d 1184, 1195 (9th Cir. 2001) (discussing *Fuller*, 47 F.3d at 1526, 1528); *accord Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 953-54 (9th Cir. 1999) (plaintiff's supervisor "verbally harassed her" and "treat[ed] her unfairly by reprimanding her for minor incidents"). Because the activity for which Westendorf alleges she was terminated was not protected activity under Title VII, she has failed to state a prima facie case of retaliation.

Moreover, even if Westendorf could establish a prima facie case, she has failed to raise a genuine issue of material fact as to whether West Coast's legitimate, non-retaliatory reason for terminating her was a pretext for discrimination. To prove that the defendant's proffered reason is a pretext for discrimination, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "[W]hen the plaintiff relies on circumstantial evidence [and produces no direct evidence of discrimination], that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)). Here, West Coast has submitted evidence that during the July 29 meeting with Mario, Westendorf refused to follow any instructions by Joslyn or Mario that she disagreed with, and that he accepted her resignation and refused to rehire her on that basis. *See* Doc. #29, Exh. 10 at 45-48, 53. While Westendorf has

submitted her own sworn testimony denying that she resigned and asserting that she was terminated, she has submitted no evidence controverting Mario's testimony that she refused to follow instructions she disagreed with. *See* Doc. #33, p. 5 (statement of facts, citing Exh. A at 130-31, 133-34). Westendorf's bare assertion in her opposition papers that she "contends she was not insubordinate," without any citation to admissible evidence in the record, *id.* at 28, does not create a triable issue of fact. Summary judgment is therefore appropriate.

**IV.    Conclusion**

For the foregoing reasons, the court concludes that there is no genuine dispute of material fact in this case and that West Coast is entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (#28) is hereby GRANTED.

IT IS SO ORDERED. The Clerk of the Court shall enter judgment accordingly.

DATED this 30th day of March, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE